**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

SONIA GONZALEZ ORTIZ,               )          CASE NO. 1:18CV01741
                                    )
       Plaintiff,                       )
                                    )
       v.                               )          MAGISTRATE JUDGE
                                    )          JONATHAN D. GREENBERG
NANCY A. BERRYHILL,                 )
       Acting Commissioner              )
       of Social Security,              )          **MEMORANDUM OF OPINION**
                                    )          **AND ORDER**
       Defendant.                       )

      Plaintiff, Sonia Gonzalez Ortiz ("Plaintiff" or "Ortiz"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Commissioner's final decision is VACATED and

REMANDED for further consideration consistent with this opinion.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.  PROCEDURAL HISTORY

In August 2015, Ortiz filed an application for SSI alleging a disability onset date of August 1, 2012, and claiming she was disabled due to anemia, acid reflux, depression, anxiety, sleep apnea, precancerous changes of the vagina, "mild cropatonal right hand," and carcinoma of the vagina.  (Transcript ("Tr.") at 186, 217.)  The applications were denied initially and upon reconsideration, and Ortiz requested a hearing before an administrative law judge ("ALJ").  (Tr. 110, 120, 125.)

On June 28, 2017, an ALJ held a hearing, during which Ortiz, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 33.)  On November 15, 2017, the ALJ issued a written decision finding Ortiz was not disabled.  (Tr. 8-32.)  The ALJ' s decision became final on June 8, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On July 27, 2018, Ortiz filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.) Ortiz asserts the following assignments of error:

> (1)  The ALJ's evaluation of the medical opinion evidence – all of which plainly establishes that Plaintiff's mental impairments preclude her from working – is contrary to the regulations and Sixth Circuit precedent.

> (2)  The ALJ's evaluation of the functional capacity evaluation regarding Plaintiff's carpal tunnel syndrome (CTS) is contrary to the regulations and Sixth Circuit precedent.

(Doc. No. 14.)

## II.   EVIDENCE

**A.      Personal and Vocational Evidence**

Ortiz was born in May 1965 and was fifty two years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security regulations.  (Tr. 26.)  *See* 20 C.F.R. § 416.963.  She has a limited education and is able to communicate in English.  (*Id.*)  She has past relevant work as a hotel housekeeper.  (*Id.*)

**B.      Relevant Medical Evidence[2]**

**1.      Mental Impairments**

On September 8, 2014, Ortiz visited psychiatrist Lendita Haxhiu-Erhardt, M.D., for a medication management appointment.  (Tr. 381.)  Ortiz described continued depression and paranoia.  (*Id.*)  She reported hearing voices and forgetfulness.  (Tr. 382.)  On examination, Ortiz had a logical thought process, no evidence of paranoia, intact memory, and fair insight and judgment.  (*Id.*)  Dr. Haxhiu-Erhardt adjusted Ortiz's medications and ordered labwork.  (*Id.*)  Ortiz's labwork revealed low B12 levels, which was a possible explanation for her mood symptoms.  (Tr. 347.)

Ortiz returned to Dr. Haxhiu-Erhardt on November 10, 2014.  (*Id.*)  She reported moodiness and paranoia, but no suicidal thoughts.  (*Id.*)  On examination, Ortiz presented with an anxious mood, but displayed no evidence of paranoia and had an intact memory.  (*Id.*)

On December 20, 2014, Ortiz presented to the emergency room with anxiety and heart palpitations.  (Tr. 412.)  The emergency room physicians provided her with a dose of Atarax, an

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

anti-anxiety medication. (Tr. 413.) Ortiz's anxiety and palpitations decreased with this medication and she was referred to a cardiologist and psychiatrist for further treatment. (*Id.*) Ortiz saw cardiologist Grace Cater, M.D., on January 19, 2015. (Tr. 682.) Dr. Cater noted Ortiz has recently been to the emergency room for an anxiety attack, had no significant arrhythmia, and her hypertension was controlled. (Tr. 682, 685, 686.)

Ortiz followed up with Dr. Haxhiu-Erhardt on February 5, 2015, reporting anxiety, an inability to relax, and poor sleep. (Tr. 326.) On examination, she displayed some paranoid thoughts, anxiety, and irritability. (*Id.*) She was able to sustain attention and concentration and her memory was intact. (*Id.*)

On February 26, 2015, Ortiz visited therapist Nellie Krawczynski, LISW, for behavioral health counseling and therapy. (Tr. 563.) She reported a history of physical abuse, anxiety in crowds, and depression. (*Id.*) On examination, Ortiz had a logical thought process, no psychotic thoughts, a normal memory, and an anxious mood. (Tr. 564.)

Ortiz saw Dr. Haxhiu-Erhardt on March 31, 2015, reporting she was "a little better," with less anxiety and agitation. (Tr. 555.) However, she was still depressed and presented with a depressed mood. (*Id.*) Dr. Haxhiu-Erhardt increased Ortiz's Zoloft dosage and prescribed Seroquel and Trazodone. (*Id.*)

On April 10, 2015, Ortiz visited Ms. Krawczynski for therapy. (Tr. 548.) She presented as withdrawn, but engaged. (*Id.*) Ortiz reported anxiety in stores and crowds, as well as worry over her family's medical history. (*Id.*) On examination, Ortiz had a logical thought process, but reported memory difficulties, was distractible, with a depressed mood and constricted affect. (Tr. 549.) On May 4, 2015, Ortiz reported high levels of anxiety to Ms. Krawczynski. (Tr. 519.)

Ms. Krawczynski found her "somewhat difficult to engage," with a worried mood and blunt affect. (*Id*.) Ortiz's thought process was logical and her memory was within normal limits. (*Id.*)

On July 14, 2015, Ortiz felt overwhelmed and stressed. (Tr. 460.) She also described "very seldom" auditory hallucinations. (*Id*.) On examination, she displayed no paranoia and her judgment and insight were fair. (*Id*.) Dr. Haxhiu-Erhardt increased Ortiz's Wellbutrin dosage. (*Id*.)

On September 1, 2016, Ortiz reported to Ms. Krawczynski she had an upcoming trip to Puerto Rico to visit family but was hesitant to go. (Tr. 825.) On examination, she was anxious and her mood was depressed. (Tr. 826.) Her thought process was logical, her memory normal, and she had fair judgment and insight. (Tr. 826.) Ortiz returned to Ms. Krawcznyski on October 13, 2016, indicating she decided to go to Puerto Rico and was not certain if she would return. (Tr. 798.) On examination, she was anxious with a constricted affect, but her memory and thought processes were normal. (Tr. 799.) Ortiz visit Dr. Haxhiu-Erhardt a few days later, on October 17, 2016, reporting poor sleep, worry, and frustration. (Tr. 806.) She presented as anxious, but displayed no paranoia and a logical thought process. (*Id*.)

Ortiz had another emergency room visit for heart palpitations and anxiety on October 22, 2016. (Tr. 836.) She was admitted for a cardiac evaluation. (Tr. 837.)

Ortiz ultimately did not go to Puerto Rico, reporting to Ms. Krawcznyski she was "struck by a fear of impending doom." (Tr. 787.) She described waking up in a panic with an inability to calm down. (*Id*.) On October 20, 2016, Ortiz reported she still planned on eventually returning to Puerto Rico. (*Id*.) On examination, her memory was normal and her thought

process was logical. (Tr. 788.) Her mood remained depressed and anxious and her affect was labile. (*Id.*)

On December 22, 2016, Dr. Haxhiu-Erhardt observed Ortiz continued "to have significant issues with forgetfulness" and "cannot remember simple details." (Tr. 765.) Ortiz reported "family members keep commenting on her inability to even cook a meal." (*Id.*) Dr. Haxhiu-Erhardt recommended neurological evaluation for this issue. (*Id.*) Ortiz also indicated she was paranoid and "hears her name being called all day long." (*Id.*) On examination, Ortiz had a logical thought process, a normal memory, but some paranoia and an anxious affect and mood. (Tr. 766.)

That same date, Dr. Haxhiu-Erhardt filled out a "Mental Impairment Questionnaire" form on behalf of Ortiz. (Tr. 862-863.) She reported treating Ortiz since 2012 and noted Ortiz was depressed, anxious, "extremely forgetful," "hears voices," and could not tolerate others. (*Id.*) Dr. Haxhiu-Erhardt found Ortiz had no useful ability to function in the following areas:

- maintaining attention and concentration for extended periods;

- working in coordination with or in proximity to others without being distracted by them;

- complete a normal workday and workweek without interruptions from psychologically based symptoms;

- remembering locations and work-like procedures;

- understanding and remembering detailed instructions;

- getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and

- responding appropriately to changes in the work setting.

(Tr. 862-863.)  The doctor further found Ortiz was unable to meet competitive standards in the following areas:

- carrying out detailed instructions;

- performing activities within a schedule;

- sustaining an ordinary routine without special supervision;

- performing at a consistent pace without an unreasonable number and length of rest periods;

- understanding and remembering very short and simple instructions;

- asking simple questions or requesting assistance;

- accepting instructions and responding appropriately to criticism from supervisors;

- being aware of normal hazards and taking appropriate precautions; and

- setting realistic goals or making plans independently of others.

(*Id.*)  Dr. Haxhiu-Erhardt concluded Ortiz was seriously limited, but not precluded, from the following:

- carrying out very short and simple instructions;

- managing regular attendance and being punctual within customary tolerances;

- interacting appropriately with the general public; and

- maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.

(*Id.*)  She opined Ortiz would miss three or more days of work each month and would be off-task for 50-75% of the workday, noting "this is just a guess."  (Tr. 863.)

Ortiz returned to Ms. Krawczynski on January 12, 2017, reporting she recently visited Puerto Rico. (Tr. 872.) She indicated she was able to make it to Puerto Rico without anxiety or panic attacks. (*Id*.) On examination, she had a logical thought process, denied hallucinations and suicidal ideation, and her mood was depressed and anxious. (Tr. 873.) On February 16, 2017, Ortiz reported high levels of anxiety and depression to Ms. Krawcznyski. (Tr. 922.) She indicated she was currently living with her daughter, which she found anxiety-inducing. (*Id*.) She also relayed she was planning another trip to Puerto Rico. (*Id*.) On examination, Ortiz had a logical thought process, fair judgment and insight, and normal memory. (Tr. 923.) She was distractible and her mood was depressed, anxious, and irritable. (*Id*.)

On February 23, 2017, Ortiz reported she was "less depressed," but still had insomnia and fatigue. (Tr. 944.) Dr. Haxhiu-Erhardt observed Ortiz looked tired and had an anxious mood. (Tr. 945.) She displayed no evidence of paranoia and her thought process was logical. (*Id*.) Dr. Haxhiu-Erhardt prescribed Lunesta for sleep. (*Id.*)

Ortiz attended a counseling session with Ms. Krawczynski on March 2, 2017. (Tr. 952.) She again indicated she was planning another visit to Puerto Rico and was considering moving in with her son. (*Id.*) On examination, her memory and thought processes were normal, but she was distractble, anxious, and worried. (Tr. 953.) On April 6, 2017, Ortiz reported she did not end up visiting Puerto Rico due to some issues with her older son. (Tr. 985.) She indicated the trip was rescheduled for August. (*Id.*) She continued to be distractible on examination, with an depressed, anxious, and irritable mood. (Tr. 986.)

On April 28, 2017, Ortiz was "sad and overwhelmed." (Tr. 1038.) Dr. Haxhiu-Erhardt observed Ortiz had a logical thought process and no paranoia, but a depressed and anxious

8

mood, impaired concentration and attention, and a constricted affect.  (Tr. 1038, 1039.)  She

noted Ortiz remained depressed and had significant new stressors in her life.  (Tr. 1039.)

That same date, Dr. Haxhiu-Erhardt provided the following statement regarding Ortiz:

I have been treating Ms. Caraballo since January of 2013.
Patient suffers form[sic] depression with psychotic features, hypertension,
severe sleep apnea, pernicious anemia with end organ complications.  The
most work prohibitive symptom has been progressive amnesia with
dissociation.  Patient's concentration is severely impaired and prevents her
from completing tasks on a daily basis, despite compliance with treatment.
Additionally, energy and, motivation are very poor, with ongoing impaired
cognition.

(Tr. 763.)

### 2.  Physical Impairments

On May 1, 2015, Ortiz visited physician Edward Greenberg, M.D., for right wrist

numbness and tingling.  (Tr. 525.)  She described this numbness as "episodic" and her physical

examination was overall normal.  (*Id*.)  She had negative Tinel's signs and a full range of motion

in her wrist, but 4/5 strength in her right upper extremity.  (Tr. 525, 527.)  Dr. Greenberg referred

Ortiz to a neurologist for a nerve conduction study and EMG.  (Tr. 527.)

On May 28, 2015, Ortiz visited neurologist Ikram Khan, M.D., for left temporal pain and

right hand numbness.  (Tr. 660.)  She had 4/5 weakness in her right arm, but full motor strength

elsewhere.  (Tr. 659.)  Dr. Khan ordered an EMG and a wrist splint.  (Tr. 660.)  The EMG

confirmed mild carpal tunnel syndrome.  (Tr. 447.)

Ortiz saw gastroenterologist Ronnie Fass, M.D., on July 17, 2015.  (Tr. 452.)  Dr. Fass

noted Ortiz was diagnosed with pernicious anemia in 2012 and had been regularly receiving B12

injections.  (*Id*.)  Ortiz admitted to missing a B12 dosage and was feeling fatigued.  (*Id*.)  Dr.

Fass recommended she receive B12 injections every two weeks to bring her B12 levels back up.

(Tr. 456, 457.)  Following this appointment, Ortiz underwent B12 injections every two weeks. (Tr. 438, 439, 598, 593, 579, 575.)

Ortiz returned to Dr. Kahn on August 7, 2015, reporting continued right upper extremity numbness, as well as headaches.  (Tr. 443.)  On examination, Ortiz displayed 4/5 weakness in the right arm.  (Tr. 446.)  Her sensation was normal to light touch, but she had right hypothenar eminence.  (*Id*.)  Her coordination was normal.  (*Id*.)  Dr. Khan referred Ortiz to an orthopedist. (Tr. 447.)

Ortiz visited orthopedist Blaine T. Bafus, M.D., on September 1, 2015.  (Tr. 431.)  She described pain and numbness in her right shoulder, elbow, and hand.  (*Id*.)  She indicated she wore a splint, but it was not helpful.  (*Id*.)  On examination, Ortiz had diminished sensation to light touch in her right hand, but a negative Tinel's sign and a normal wrist range of motion.  (Tr. 432.)  Dr. Bafus observed Ortiz's "symptoms and examination are not quite consistent with a classic pattern" and suggested a wrist injection.  (*Id*.)  Ortiz then underwent a lidocaine injection on the right side.  (*Id*.)

On October 1, 2015, Ortiz visited her primary care physician, Rana Feidi, M.D.  (Tr. 596.)  Dr. Feidi advised Ortiz her headaches were likely due to migraines because she had no focal neurological deficits on examination.  (*Id*.)

Ortiz saw Dr. Khan on October 9, 2015 for headaches and arm pain.  (Tr. 589.)  On examination, Ortiz had 4/5 weakness in her right arm, normal coordination, and a normal gait. (Tr. 592.)  Dr. Khan referred Ortiz to an orthopedist for another wrist injection and ordered a CT scan for her headaches.  (Tr. 593.)

On October 14, 2015, Ortiz returned to Dr. Bafus, reporting the last wrist injection was not helpful. (Tr. 588.) On examination, Ortiz's sensation was intact throughout the hand, but she reported "diminished sensation in a nonspecific fashion around the hand itself." (*Id*.) Her wrist was tender and she had full strength in the right hand. (*Id*.) Dr. Bafus concluded surgical intervention would likely be ineffective because the injection did not improve Ortiz's symptoms. (*Id*.)

On September 7, 2016, Ortiz visited her primary care doctor, Nilima Bangalore Prasanna Kumar, M.D., reporting she was considering carpal tunnel surgery. (Tr. 821.) On examination, Ortiz displayed normal reflexes and sensation and her right hand was weaker than the left. (Tr. 823.) Ortiz subsequently underwent an occupational therapy evaluation with occupational therapist Erin Mitskavich, OTR, on September 16, 2016. (Tr. 816.) She reported right hand numbness and difficulty holding objects for extended periods. (Tr. 818.) Ortiz indicated she was trying to avoid surgery and wore a cool splint for the majority of the day. (*Id*.) On examination, Ortiz had a positive Tinel's sign on the right, but a negative Phalen's. (*Id*.) Her elbow, forearm, and wrist ranges of motion were within functional limits. (*Id*.) She had decreased grip strength on the right side. (*Id*.) Ms. Mitskavich issued Ortiz a designer wrist and thumb splint and provided her with several exercises. (Tr. 819.)

Ortiz returned to Ms. Mitskavich on October 3, 2016. (Tr. 813.) She reported she was not certain if her wrist and thumb splint were helpful. (*Id*.) On examination, Ortiz had no atrophy or swelling, a negative Phalen's sign, and a positive Tinel's. (*Id*.) Ms. Mitzkavich observed Ortiz's splint looked unused and advised Ortiz she needed to wear it at all times. (Tr. 815.) Ortiz attended another occupational therapy visit on October 17, 2016, and reported she

was performing her home exercises. (Tr. 794.) On examination, Ortiz had no visible atrophy and mild swelling. (*Id.*)

On November 2, 2016, Ortiz reported a recent emergency room visit for chest pain and shortness of breath to Dr. Kumar. (Tr. 783.) Dr. Kumar noted Ortiz's most recent stress test was negative and observed her chest pain was possibly related to anxiety. (Tr. 783, 785.) Dr. Kumar prescribed hypertension medication and advised Ortiz to follow up with a cardiologist. (Tr. 785.)

Ortiz had another occupational therapy session with Ms. Mitskavich on November 7, 2016. (Tr. 772.) She reported "no pain at all," but increased numbness in her fingers and continued difficulty grasping and holding objects. (*Id.*) Ms. Mitskavich noted Ortiz had improved daytime pain, but was still having numbness, pain, and tingling at night. (Tr. 774.)

On January 18, 2017, Ortiz consulted with orthopedist Todd Morrison, M.D. for her carpal tunnel syndrome. (Tr. 878.) She indicated her wrist splint was ineffective and she was contemplating surgery. (*Id.*) On examination, Ortiz had numbness in three of her fingers and positive Tinel's and Phalen's signs. (*Id.*) Dr. Morrison concluded it was "unclear" if surgery would be effective, but it was not "unreasonable to offer surgical intervention at this time given EMG evidence of [carpal tunnel syndrome] and physical exam findings today." (Tr. 879.) Dr. Mirrison advised Ortiz to call his office if she decided to go forward with the procedure. (*Id.*)

Ortiz began to report right knee pain and swelling to nurse practitioner Maryann Woods, CNP, on January 19, 2017. (Tr. 895.) On examination, she had tenderness, 4/5 strength, and a full range of motion in the right knee. (Tr. 896.) X-rays revealed early marginal spurring

involving the patellofemoral joint.  (*Id.*)  Ms. Woods provided Ortiz with exercises and Naprosyn.  (*Id.*)

That same date, Ortiz underwent a functional capacity assessment with physician Yevgeniya Dvorkin Wininger, M.D.  (Tr. 884.)  On examination, Ortiz had a full, active range of motion in all of her joints except her right wrist.  (Tr. 889.)  Ortiz's right hand had a decreased range of motion and was hypersensitive to light touch.  (*Id.*)  She was able to lift 10-15 pounds at the waist level with no significant pain, however, this was done primarily using the left hand.  (*Id.*)

Based upon this examination, Dr. Dvorkin Wininger provided the following conclusions regarding Ortiz:

> Based on the history and physical exam, the patient has mild functional limitations.  She should avoid repetitive activities or lifting above 5 lbs with the right hand only.
>
> The patient can sit for a maximum of 120 minute intervals for a maximum of 6-8 hours per day.  She can stand for a maximum of 15-20 min[sic] minute intervals for a maximum of 4-6 hours per day.
>
> I believe its doubtful that she meets disability criteria based only on [musculoskeletal] concerns, as evaluated thoroughly today and in light of the physical exam findings.
>
> Furthermore her hypersensitivity of the hand is out of proportion to what one would expect from [carpal tunnel syndrome] alone.

(Tr. 889.)

On January 24, 2017, Ortiz visited cardiologist Grace Cater, M.D.  (Tr. 902.)  She denied recent palpitations but described occasional chest pain.  (*Id.*)  Dr. Cater recommended Ortiz continue to take Lipitor.  (Tr. 909.)

13

Ortiz visited Dr. Kumar on February 9, 2017, reporting right knee pain and weight gain. (Tr. 913.)  On examination, Ortiz displayed right knee tenderness and a normal range of motion in both knees.  (Tr. 916.)  She had no edema.  (*Id*.)  Dr. Kumar advised Ortiz to lose weight and continue taking her hypertension medications.  (*Id*.)  Ortiz returned to Dr. Kumar on April 4, 2017, with right knee tenderness, but a normal range of motion.  (Tr. 980.)  Dr. Kumar referred Ortiz to physical therapy for her knee pain.  (*Id*.)

## C.    State Agency Reports

### 1.    Mental Impairments

On October 21, 2015, Ortiz underwent a consultative psychological evaluation with psychologist Mitchell Wax, Ph.D.  (Tr. 566.)  She reported anxiety and depression.  (Tr. 567.) She described difficulty being around others and maintaining focus.  (Tr. 568.)  She indicated she did not cook often due to forgetfulness, but did her laundry and cleaning.  (*Id*.)  She relayed she had panic attacks and did not like to go to the store.  (*Id*.)  She "presented as an anxious woman who appeared intellectually limited" and was unable to tell time.  (*Id*.)  Ortiz described crying spells, hearing voices, panic attacks, and "body tremors were noted."  (Tr. 569.)  Dr. Wax found there "was evidence of mental confusion, as this individual intermittently distorted questions and did not answer questions directly."  (*Id*.)

Dr. Wax administered the WAIS-IV to test Ortiz's intelligence, but deemed the results invalid because Ortiz was "functioning at a higher level than test results indicate."  (Tr. 570.)  Dr. Wax estimated Ortiz's IQ to be in the borderline range of intelligence.  (*Id*.)  During this testing, Ortiz "appeared distant and disengaged" and "rocked intensely in her chair."  (*Id*.)  Dr. Wax also

administered the Wechsler Memory Scale IV, but these results were also deemed invalid.  (*Id.*)

During the memory testing, Ortiz "appeared anxious and inattentive."  (*Id.*)

Based upon this evaluation, Dr. Wax diagnosed Ortiz with borderline intellectual functioning, major depression, and panic disorder with agoraphobia.  (*Id.*)  Dr. Wax provided the following opinion on Ortiz:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

This individual would have difficulty understanding, remembering, and carrying out instructions on a job due to low intelligence, and due to her distorting questions and not answering questions directly.  Throughout the evaluation she was very involved with her medical problems, and at times needed to be cut short and redirected when she digressed and tried to go into her medical problems.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**

This individual would have difficulty maintaining attention and concentration on a job due to her depression and anxiety.  This individual intermittently distorted questions and did not answer questions directly.  She complained of difficulty concentrating, and intermittent problems with concentration were noted.  She stated she is not persistent at home, "My daughter and son-in-law do most of the chores.["]  She said though that she is able to do some chores, as she does her own laundry every two weeks, and cleans the house regularly sweeping weekly and cleaning the bathroom once a week.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

This individual would have difficulty responding appropriately to supervisors and coworkers in a work setting due to her depression, anxiety, and low intelligence.  She stated she has no friends.  She said she is taken care of by her daughter and son-in-law, and said her twins come over twice a week to visit with her and her daughter.  Because of this individual's over involvement with medical problems, and do[sic] to her anxiety, she would

have trouble responding appropriately to supervisors and coworkers in a work setting.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

This individual would not respond appropriately to work pressures in a work setting due to her depression and anxiety. This individual tends to exaggerate her problems. Because of this individual's low intellectual functioning, she would also have difficulty responding appropriately to work pressures. When caught in overstatements she became extremely anxious and embarrassed during today's evaluation.

(Tr. 571.)

On November 6, 2015, state agency psychologist Kathleen Malloy, Ph.D., reviewed Ortiz's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 85, 87-89.) Dr. Malloy concluded Ortiz had (1) mild restrictions in her activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (*Id*.) As for her mental RFC, Dr. Malloy opined Ortiz was moderately limited in her abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) make simple work-related decisions; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (8) respond appropriately to changes in the work setting. (Tr. 88, 89.) Dr. Malloy found no significant limitations in Ortiz's abilities to (1) remember locations and work-like procedures; (2)

16

understand, remember, and carry out very short and simple instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (7) be aware of normal hazards and take appropriate precautions; (8) travel in unfamiliar places or use public transportation; and (9) set realistic goals or make plans independently of others. (*Id*.) Dr. Malloy explained the basis of her decision as follows:

> [consultative examiner] diagnosed [borderline intellectual functioning] Diagnosis is supported by [claimant's] presentation during [consultative examination] and work [history]. [Claimant] is capable of simple, repetitive 1-2 step tasks.
>
> ***
>
> Claimant's concentration & pace will be negatively impacted by anxiety and depressive symptoms. Claimant is capable of working in an environment with infrequent interruptions, and without demands for fast pace or strict production quotas.
>
> ***
>
> [Claimant's] anxiety is exacerbated when around unfamiliar people or large groups of people. She retains the capacity for occasional superficial social interactions.
>
> ***
>
> Due to [borderline intellectual functioning] and anxiety, [claimant] would adapt best to a relatively static work setting where changes are explained easily in advance.

(*Id.*)

On February 4, 2016, state agency physician Carl Tishler, Ph.D., reviewed Ortiz's medical records and completed a PRT and Mental RFC Assessment. (Tr. 101-102; 104-106.) Dr. Tishler adopted the findings of Dr. Malloy. (*Id.*)

### 2. Physical Impairments

On October 6, 2015, state agency physician Leon D. Hughes, M.D., reviewed Ortiz's medical records and completed a Physical RFC Assessment. (Tr. 87.) Dr. Hughes adopted the findings of the previous ALJ as follows:

> The claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except for the following additional limitations: the claimant cannot climb ladders, ropes, or scaffolds; can perform occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.

(*Id.*)

On February 3, 2016, state agency physician Diane Manos, M.D., reviewed Ortiz's medical records and completed a Physical RFC Assessment. (Tr. 103.) Dr. Manos also adopted the findings of the previous ALJ. (*Id.*)

### D. Hearing Testimony

During the June 28, 2017 hearing, Ortiz testified to the following:

- She lives with her two adult children. (Tr. 39.) She has an eleventh grade education. (Tr. 41.)

- She is unable to work due to bilateral carpal tunnel syndrome, depression, panic attacks, and forgetfulness. (Tr. 42.) She has trouble holding onto objects and she can "do barely nothing with [her] right hand." (*Id.*) She has not undergone any surgery on her hands, but she did participate in therapy and receive injections. (*Id.*) The carpal tunnel is in both hands, but her right hand is worse than the left. (Tr. 48.)

- She cannot be around a lot of people. (Tr. 43.) She has panic attacks when she is in crowds. (*Id.*) She needs to re-read instructions. (*Id.*)

- She does not cook because she will forget when she has something on the stove. (Tr. 44.) She visits the grocery store with her son because she will forget where she is going. (*Id.*)

- She enjoys listening to music. (Tr. 44.) She attends church. (Tr. 45.) She attempts to do laundry, but she forgets to finish it. (*Id.*)

- Her last trip to Puerto Rico was in 2016. (Tr. 46.) She was scheduled to go again more recently, but had to cancel due to a panic attack. (*Id.*)

- She has anemia and requires vitamins and monthly B12 injections. (Tr. 49.) She also has sleep apnea and uses a CPAP machine. (*Id.*) She is "always tired" and has little energy. (*Id.*) She dozes off during the day. (Tr. 50.)

- She has arthritis in her right leg and it hurts to use the stairs. (Tr. 51.) She can stand for about 30-60 minutes at a time. (*Id.*)

The VE testified Ortiz had past work as a hotel housekeeper. (Tr. 53-54.) The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical individual of the claimant's age and education and with the past job that we described. Further assume this individual is limited as follows. This is a light exertional hypothetical with the following additional limitations. This individual can operate hand controls frequently with the right hand, can handle and finger frequently with the right hand. This individual can occasionally climb ramps and stairs, never ladders, ropes or scaffolds, can occasionally balance, stoop, knee[l], crouch and crawl. This individual can – is limited to performing simple, routine and repetitive tasks, but not at a production rate pace, can tolerate occasional interactions with supervisors, co-workers and the public and can tolerate routine workplace changes where any changes outside of the routine are explained in advance, and this person can only occasionally push and pull with the right lower extremity.

(Tr. 54-55.)

The VE testified the hypothetical individual would be able to perform Ortiz's past work as a hotel housekeeper as classified in the Dictionary of Occupational Titles, but would not be able to perform the job as Ortiz performed it. (Tr. 55.) The VE further explained the

hypothetical individual would also be able to perform other representative jobs in the economy, such as food service worker (D.O.T. #311.677-010), mail clerk (D.O.T. #209.687-026), and office helper (D.O.T. #239.567-010).  (*Id.*)

## III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past

relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since July 16, 2015, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: obesity, hypertension, anemia, carpel tunnel syndrome of the right wrist, patellofemoral stress syndrome of the right knee, major depressive disorder, anxiety disorder, and borderline intellectual functioning (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b).  The claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently.  The claimant can stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday.  The claimant can operate hand controls frequently with the right hand and foot controls frequently with the right foot.  The claimant can handle and finger frequently with her right hand.  The claimant can only occasionally push and pull with the right lower extremity.  The claimant can occasionally climb stairs and ramps, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl.  The claimant is limited to performing simple, routine and repetitive tasks but not at a production rate pace.  The claimant can tolerate occasional interaction with supervisors, co-workers and the public.  The claimant can tolerate routine workplace changes where any changes outside of the routine are explained in advance.

5.    The claimant is capable of performing past relevant work as a hotel housekeeper.  This work does not require the performance of work-related

21

activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6.    The claimant has not been under a disability, as defined in the Social Security Act, since July 16, 2015, the date the application was filed (20 CFR 416.920(f)).

(Tr. 14-27.)

# V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing

22

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

**A. Dr. Haxhiu-Erhardt's December 2016 opinion**

In her first assignment of error, Ortiz argues the ALJ's evaluation of the opinion of her treating psychiatrist, Dr. Haxhiu-Erhardt "does not comport with the regulations or Sixth Circuit precedent." (Doc. No. 14 at 19.) She asserts the ALJ "seemingly gave no other obvious consideration to the fact that Dr. Haxhiu-Erhardt had been [her] treating psychiatrist for four years." (*Id*. at 20.) Ortiz maintains while the ALJ rejected Dr. Haxhiu-Erhardt's opinion on the basis that it was inconsistent with the medical evidence, the "opinion is not inconsistent with her examination findings, or with the other evidence of record." (*Id*. at 20-21.) She contends the ALJ "merely cherry picked the normal findings, while disregarding the abnormal mental health findings that he himself cited in the decision." (*Id.* at 21.) Ortiz also argues the activities of daily living the ALJ referenced to reject Dr. Haxhiu-Erhardt's opinion were "sporadic" and "contradicted" by the medical record. (*Id.* at 23.)

The Commissioner maintains the ALJ properly evaluated Dr. Haxhiu-Erdhardt's opinion. (Doc. No. 16 at 13.) She asserts "Dr. Haxhiu-Erhardt's treating relationship with [Ortiz] does not free her opinion from scrutiny." (*Id.*) The Commissioner argues the ALJ "provided valid reasons based on the record to support his finding" and "reasonably concluded that the record as a whole, however, did not support Dr. Haxhiu-Erhardt's highly restrictive opinion given the consistently normal findings." (*Id*. at 15, 16.) She also maintains the ALJ "did not take [Ortiz's] daily activities out of context." (*Id.* at 16.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[3] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

---

[3]    Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[4]    Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating

source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. App'x 498, 505 (6th Cir. 2013).

The opinion, however, "is not entitled to any particular weight." *Turner*, 381 Fed. App'x at 493.

*See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

As noted *supra*, Dr. Haxhiu-Erhardt, Ortiz's treating psychiatrist, submitted a medical

opinion regarding Ortiz in December 2016.[5] (Tr. 862-863.) At step four of the sequential

evaluation, the ALJ considered this opinion as follows:

> Lendita Haxhiu-Erhardt, M.D., completed a Mental Impairment
> Questionnaire dated December 22, 2016 (Ex. B7F). She noted a treating
> relationship since 2012 (Ex. B7F/1). She listed clinical findings that
> included feeling depressed, anxious, being extremely forgetful, hears
> voices, and cannot tolerate people. Dr. Haxhiu-Erhardt opined that the
> claimant's limitations in sustained concentration and persistence and social
> interaction ranged from seriously limited to no useful ability to function
> (Ex. B7F/1-2). Limitations in understanding and memory and adaptation
> ranged from unable to meet competitive standards to no useful ability to
> function (Ex. B7F/2). Dr. Haxhiu-Erhardt also opined that the claimant
> would be absent from work three or more days per month and "off task" 50-
> 75 percent of an eight-our workday but indicated "this is just a guess."
>
> I note the treating relationship duration and that Dr. Haxhiu-Erhardt is a
> treating source specializing in psychiatry (Ex. B7F/1). I find that Dr.
> Haxhiu-Erhardt's opinion regarding serious limitations is consistent with
> examinations that showed the claimant had ongoing depressed, sad, and
> anxious mood, and at times, impaired attention and concentration,
> distractibility, and difficulty with memory (Ex. B6F/3, 14, 25, 36, 43, 63,
> B8F/3, 10, 60, 82, 90, 123, B9F/19, 43). However, I find that this opinion
> regarding a degree of no useful ability or unable to meet competitive
> standards is inconsistent with examinations that demonstrated the claimant
> was routinely well groomed with good hygiene cooperative, and had
> normal speech, logical and organized thought process, sustained attention
> and concentration, normal memory, fair judgment and insight, and adequate

---

[5]     The Court acknowledges Ortiz raised arguments regarding the ALJ's treatment of
        Dr. Haxhiu-Erhardt's April 2017 opinion, as well as the opinions of other medical
        sources. (Doc. No. 14 at 20, 17, 15.) Because the Court is finding the ALJ
        improperly evaluated Dr. Haxhiu-Erhardt's December 2016 opinion, it is limiting
        its discussion and analysis to this opinion in the interests of judicial economy.

fund of knowledge support these opinions (Ex. B1F/159, B6F/3, 14, 25, 36, 63, B8F/3, 10, 60, 82, 90, 123, B9F/19, 43).  In addition, I find that the degrees of limitation are not supported by the record that showed the claimant's ability to engage in daily activities, such as managing her personal care, performing household tasks, interacting with family on a daily basis, and leaving the country for vacation (Ex. B6E/5, B2F/2-4, B8F/9, B9F/33).  Further, Dr. Haxhiu-Erhardt did not provide support or explanation, and in particular, indicating that her opinion regarding "off task" was just a guess.  Therefore, I give partial weight to this opinion.

(Tr. 23-24.)

The Court finds the ALJ failed to properly evaluate Dr. Haxhiu-Erhardt's December 2016 opinion.  As noted above, an ALJ must provide "good reasons" for the weight assigned to treating source opinions, and articulate those reasons in order to allow for meaningful appellate review.  Here, while the ALJ did provide several reasons for discounting Dr. Haxhiu-Erhardt's December 2016 opinion, they are not supported by substantial evidence.

In particular, the ALJ discounted this opinion on the basis that the more restrictive limitations offered by Dr. Haxhiu-Erhardt were "inconsistent with examinations."  (Tr. 24.)  The ALJ then generally referenced treatment notes in which Ortiz had good hygiene, was cooperative, had "normal speech, logical and organized thought process, sustained attention and concentration, normal memory, fair judgment and insight, and adequate fund of knowledge." (*Id*.)  However, this is not an accurate depiction of the treatment notes cited by the ALJ.  While Ortiz's mental health treatment providers may have noted intact memory, concentration, insight and judgment during treatment sessions, they also observed Ortiz heard voices, was forgetful, presented with a depressed, anxious, and blunt affect, displayed paranoid thoughts, was distractible, and would be difficult to engage on occasion.  (Tr. 382, 347, 326, 555, 549, 519, 460, 826, 799, 788, 765, 766, 923, 953, 986, 1039.)  For example, on December 22, 2016, Dr.

Haxhiu-Erhardt noted while Ortiz had a logical thought process and intact memory, she displayed "some paranoia" and her mood and affect were anxious. (Tr. 766.) Ortiz also reported at that time she "hears her name being called all day long" and felt "mildly confused most of the time." (Tr. 765.) During a February 2017 visit with Dr. Haxhiu-Erhardt, Ortiz again displayed a logical thought process and normal memory, but was distractible with a depressed and anxious mood. (Tr. 923.)

Moreover, the ALJ's finding Dr. Haxhiu-Erhardt's opinion was inconsistent with the treatment notes is not supported by substantial evidence. Ortiz complained of auditory hallucinations and forgetfulness throughout the relevant period. (Tr. 382, 460, 765.) Ortiz also consistently presented with a depressed and anxious affect, and often described paranoia. (Tr. 382, 347, 326, 555, 549, 826, 799, 788, 765, 766.) She was noted to be distractible or difficult to engage on numerous occasions. (Tr. 549, 519, 923, 953, 986.)

Ortiz also repeatedly endorsed high levels of anxiety. (Tr. 519, 806, 776, 922.) In October 2016, she cancelled plans to visit family in Puerto Rico because she was "struck by a fear of impending doom." (Tr. 787.) She woke up in a panic prior to her flight and was unable to calm down. (*Id.*) Ortiz also visited the emergency room on two occasions for chest pain and palpitations, symptoms later determined to be related to anxiety. (Tr. 412, 413, 682, 836, 785.) Notably, the ALJ inaccurately asserted Ortiz required no "emergency room visits for exacerbations of . . . mental symptoms." (Tr. 21.)

Further, Ortiz's October 2015 consultative examination findings supported the more significant restrictions offered by Dr. Haxhiu-Erhardt. During the examination, Ortiz "presented as an anxious woman who appeared intellectually limited." (Tr. 568.) Ortiz described auditory

hallucinations, panic attacks and was unable to tell time. (Tr. 568, 569.) Dr. Wax, the consultative examiner, noted "body tremors" and "evidence of mental confusion, as [Ortiz] intermittently distorted questions and did not answer questions directly." (Tr. 569.) During testing, Ortiz "appeared distant and disengaged," "rocked intensely in her chair,"and was "anxious and inattentive." (Tr. 570.) Dr. Wax observed "intermittent problems with concentration." (Tr. 571.)

The Court acknowledges the ALJ briefly noted some of this evidence prior to discussing Dr. Haxhiu-Erhardt's opinion. (Tr. 21.) However, the ALJ selectively parsed through these same treatment notes when discounting the opinion of Dr. Haxhiu-Erhardt. Indeed, the ALJ does not sufficiently explain how, in light of the above evidence, referencing several normal examination findings supports affording long-time treating physician Dr. Haxhiu-Erhardt's opinion "partial weight." As noted *supra*, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F.Supp.2d at 877. While the ALJ recited some of the medical evidence earlier in the decision, he failed to offer any meaningful explanation for his conclusion that Dr. Haxhiu-Erhardt's opinion was inconsistent with that evidence. *See Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cassels v. Comm'r of Soc. Sec.*, 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016).

The ALJ also reasoned Dr. Haxhiu-Erhardt's opinion was inconsistent with Ortiz's "ability to engage in daily activities, such as managing her personal care, performing household tasks, interacting with family on a daily basis, and leaving the country for vacation." (Tr. 24.)

This is not an accurate depiction of Ortiz's documented abilities. While Ortiz did live and interact with her family, the treatment notes reveal this presented many difficulties for her. In October 2016, she was living with her eldest daughter, but did "not feel comfortable" in that living situation. (Tr. 798.) She described several conflicts with her son in law at that time. (Tr. 798, 806.) In November 2016, Ortiz increased anxiety with loudness in the home. (Tr. 776.) Ortiz continued to feel anxious over her living situation in December 2016. (Tr. 765.) In February 2017, Ortiz indicated she had plans to move in with her son because she was "too anxious" in her daughter's home. (Tr. 922.) She again reported she wanted to move in with her son in March 2017 and she described a recent argument with her daughter and son in law. (Tr. 952.) In April 2017, her daughter "kicked her out of the house" and Ortiz reported feeling "sad and overwhelmed." (Tr. 1038.)

The ALJ's assertion Ortiz leaves "the country[6] for vacation" is also a skewed description of Ortiz's activity. (*See* Tr. 24.) Ortiz was born in Puerto Rico and still has family members who reside there. (Tr. 567, 798.) In October 2016, she was planning to visit her family in Puerto Rico and was considering a permanent move there. (Tr. 798.) However, just prior to her scheduled departure, Ortiz visited the emergency room for anxiety. (Tr. 836.) Ortiz contacted her counselor several days later, reporting she could not board the plane to Puerto Rico because she was "struck by a fear of impending doom." (Tr. 787.) She reported she "woke up in panic" and could not calm herself down. (*Id*.) Ortiz eventually was able to travel to Puerto Rico in December 2016 without experiencing anxiety or panic. (Tr. 872.) She then made plans to visit again in March 2017, but did not go through with the trip. (Tr. 985.) At the June 2017 hearing,

---

[6] The Court notes that, despite the ALJ's characterization of Ortiz's trip as international travel, Puerto Rico is part of the United States.

Ortiz testified she had recently cancelled another scheduled trip to Puerto Rico due to a panic attack. (Tr. 46.) The ALJ reference to Ortiz's one visit to Puerto Rico takes the circumstances surrounding Ortiz's travel out of context.

Finally, the ALJ discounts Dr. Haxhiu-Erhardt's limitations on the basis of Ortiz's ability to perform household tasks and manage her personal care. (Tr. 24.) The ALJ disregards the fact Ortiz testified she does not cook because she will leave items on the stove and her son must accompany her to the grocery store. (Tr. 44.) Ortiz also testified while she attempts to do her laundry, she will often forget to finish it. (Tr. 45.) This testimony is bolstered by the fact Ortiz reported to Dr. Haxhiu-Erhardt that "multiple family members keep commenting on her inability to even cook a meal." (Tr. 765.) During her consultative examination, Ortiz again reported she avoided cooking due to forgetfulness. (Tr. 568.) She described some cleaning, but it was limited in nature – washing the dishes once a week and doing the laundry every two weeks. (*Id.*) She again reported the need for someone to accompany her to the grocery store. (*Id.*) While Ortiz admitted to being able to perform a limited range of household tasks, the ALJ fails to explain how this level of activity conflicts with Dr. Haxhiu-Erhardt's various limitations.

In sum, the ALJ's decision fails to set forth good reasons for discounting the December 2016 opinion of Dr. Haxhiu-Erhardt. Accordingly, the Court finds a remand is necessary, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Dr. Haxhiu-Erhardt.

Finally, as this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Ortiz's remaining arguments and assignments of error.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and
REMANDED for further proceedings consistent with this decision.

**IT IS SO ORDERED.**


         *s/Jonathan D. Greenberg*
        Jonathan D. Greenberg
        United States Magistrate Judge

Date: June 11, 2019